United States District Court
Southern District of Texas
**ENTERED**
February 19, 2016
David J. Bradley, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **PRAETORIAN INSURANCE COMPANY,** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| **VS.** | § | **CIVIL ACTION NO. 4:14-CV-3281** |
| | § | |
| **ARABIA SHRINE CENTER HOUSTON,** | § | |
| | § | |
| **Defendant.** | | |

## <u>MEMORANDUM AND ORDER</u>

Before the Court are four motions: the motion for partial summary judgment filed by Plaintiff Praetorian Insurance Company, (Doc. No. 61), the cross-motion for partial summary judgment filed by Defendant Arabia Shrine Center Houston (Doc. No. 76), the motion for summary judgment on Defendant's counterclaims filed by Praetorian (Doc. No. 77), and the motion to strike filed by Arabia Shrine (Doc. No. 87). After carefully reviewing the parties' filings, the record, and the applicable law, the Court finds that that Praetorian's motions should be granted, Arabia Shrine's cross-motion should be denied, and the motion to strike should be denied as moot.

## I.   BACKGROUND

This case is an insurance coverage dispute. The following facts are undisputed, except where noted.

Praetorian issued a commercial property insurance policy effective January 1, 2014, to January 1, 2015, covering the Arabia Shrine Temple at 10510 Harwin Drive in Houston, Texas. (Doc. No. 61-3 at 7, 27.) On March 20, 2014, between 11:15 and 11:30 AM, an Arabia Shrine

employee was in her office when she heard a loud noise and seconds later saw water seeping through the baseboards. (Doc. No. 76-19 at 6.) Another employee heard the same noise. Both saw a large volume of water in the building's interior. Eventually, the water shut off valve to the City of Houston water main was shut off at about 3:00 PM. (*Id.* at 6.) It was later determined that "[a]n 8" diameter fire suppression metal pipe located below grade failed at the elbow," causing "over one million gallons of water to be released into the interior of the building." (*Id.* at 3.)

*Praetorian's Investigation*

Arabia Shrine reported the loss to Praetorian on the same day that the pipe failed. (Doc. No. 77-1 at 16–17.) Praetorian engaged R.D. Sukolics of Cunningham Lindsey Group, Ltd. to act as the on-site adjuster and A.J. Ormsby of York Risk Services Group, Inc. to act as the claims administrator. (Doc. No. 76-4 at 2.) Mr. Sukolics visited the site on March 24, 2014. He then retained Corey Green, P.E., of Rimkus Consulting Group, Inc. to inspect the site. (Doc. No. 61-8 at 3.)

On March 28, 2014, Mr. Ormsby sent a letter to Arabia Shrine. This letter identified which provisions of the policy appeared to be implicated by the damage from the failed pipe. (Doc. No. 77-1 at 5.)

On April 7, 2014, Mr. Ormsby issued an initial report to Praetorian's parent company, QBE. (Doc. No. 76-7.) Mr. Ormsby described the damages at the site as "extensive throughout approximately 95% of the floor space about the building. Most is the damage resulting from the exposure to the discharge of a heavy volume of water from the fire sprinkler main, where a break occurred under the floor slab." (*Id.* at 2.) He identified the cause of loss as "Accidental Discharge." (*Id.* at 1.) Mr. Ormsby outlined possible conflicting terms in the policy for determining coverage. (*Id.* at 4–6.)

2

On April 14, 2014, Rimkus issued an interim report. Mr. Green had visited the site and inspected the failed pipe, which had been removed from its location "beneath the concrete floor slab of the ballroom lobby." (Doc. No. 61-8 at 4.) The short radius elbow of the 8-inch firewater line had a three-inch by five-inch hole in it. Mr. Green noted corrosion on "the inside and outside surfaces of the short radius elbow" near the hole. (*Id.*) He concluded that the hole "resulted in a below slab water leak" and "was most likely the result of either long-term corrosion or a material defect in the elbow." (*Id.* at 6.) Mr. Green further concluded:

> The following events and structural distress occurred as a result of the below slab leak in the firewater line: . . .
>
> - The firewater line leak resulted in heave and cracking of the concrete floor slab in the ballroom lobby.
> - Water from the leak entered the building envelope through cracks in the ballroom lobby floor as well as through various construction and expansion joints in the perimeter pour strip.
> - The firewater line leak resulted in diagonal cracks near the slab level in the 1st and 2nd south side, tilt-wall panels along the perimeter wall of the ballroom lobby.

(*Id.* at 6–7.)

On April 15, 2014, Mr. Sukolics issued his second report. (Doc. No. 76-13.) He explained the cause of loss as follows:

> [A]n 8 inch fire water line near the southwest Ballroom Entry developed a major leak. The line was located directly under the foundation and was buried at a depth of about 12 feet. After the break, water and mud entered the building at the perimeter and through the expansion joints in the foundation slab. After excavating the line, a 3 inch by 5 inch blow-out was found in the short radius elbow of the 8 inch fire water line, Inspection showed some evidence of corrosion on the piping but Engineer Green advises that he cannot rule out some type of defect. As previously noted, the piping in this area is almost 40 years old.

(*Id.* at 3.) Mr. Sukolics further described the scope of damage:

> The heaviest damage occurred in the Ballroom entry where the concrete slab foundation was moved upward by the force of the water. This appears to be the

3

only area of the building with slab damage. There is some washout under the slab in the adjacent main ballroom but indications are that it is not as extensive. Some stability problems have developed in the ballroom entryway and inspection shows that the tilt-up wall has been substantially weakened when this entryway was added in 1997. The problem was then exacerbated by the wash-out caused by the broken main that was only a few feet away. . . .

The remaining areas of the building sustained damage to the floor coverings, baseboards, and sheetrock walls. . . . Most of the hardwood furniture will be repairable but the laminated furnishings and some of the hardwood cabinetry and trim are already coming apart. About 95% of the building sustained water damage.

(*Id.* at 3.)

On April 25, 2014, Mr. Ormsby emailed Craig Stanley of QBE. He expressed his "opinion that the water discharge from a pipe within the envelop of the structure would not be considered ground water, to which the policy exclusions relative to water apply." (Doc. No. 76-8 at 2.) Mr. Stanley replied that his boss, Timothy Simpson, conducted a preliminary review and disagreed with Mr. Ormsby's opinion of coverage. (*Id.* at 2.) On April 29, 2014, Mr. Stanley emailed Mr. Simpson with his opinion that coverage applies. Mr. Stanley explained,

I do not believe this is ground water or water below the surface of the ground. The size of the hole and the sudden onset of damage negate any involvement of continuous or repeated seepage or leakage of water for 14 days or more. The cause is "accidental discharge or leakage of water as a direct result of breaking apart or cracking of a plumbing or other system on premises containing water or steam.["]

(Doc. No. 76-9 at 2.)

On April 30, 2014, Mr. Ormsby indicated that Praetorian wanted a metallurgist to examine the pipe. (Doc. No. 76-10 at 2.) He said that further analysis was required because "the cause of the break in the pipe was not verified by the on-site visual examination." (*Id.*) A metallurgical analysis was never conducted, however, because the pipe went missing. (Doc. No. 76-11 at 2–3.)

4

On June 6, 2014, Rimkus issued a second interim report. Mr. Green had returned to the site to trace the failed pipe's connections. He determined that "[t]he failed pipe is part of the automatic fire sprinkler system for the facility" and "is the primary fire sprinkler supply line." (Doc. No. 61-9 at 1.)

On June 7, 2014, Mr. Ormsby sent QBE another initial report.[1] He estimated the total loss projection as $1,697,478.51. (Doc. No. 85-13 at 5.)

*Clean Up and Repair Costs*

Arabia Shrine hired ServPro to remove the water and dry out the building. (Doc. No. 76-7 at 4.) These services cost $237,156.21. (*Id.*; Doc. No. 61-11 at 3.) Arabia Shrine hired PrimeCo Services to make repairs. PrimeCo Services removed and replaced the failed pipe. To do so, they had to cut the concrete slab, excavate, and back fill. These services cost $12,376. (Doc. No. 61-10.) Arabia Shrine received bids from PrimeCo for $193,339 to demolish the floor and cut the walls for restoration and for $12,066.90 to move and store the contents of the building during the restoration. (Doc. No. 76-7 at 4.) Arabia Shrine retained an expert for litigation who provided a loss estimate[2] of $1,821,839.82. (Doc. No. 85-24 at 4.)

Praetorian retained JS Held, Inc., a construction consulting firm, to prepare an estimate of the damages. JS Held estimated $203,732.90 for demolition costs and $756,925.55 for reconstruction. (Doc. No. 76-15 at 5.) This estimate excluded foundation, tilt wall panel repairs, doors, and cabinetry.

---

[1] The record reflects that this was Mr. Ormsby's third initial report. He sent a second initial report on May 7, 2014. (Doc. No. 85-15.)

[2] The expert defines "loss estimate" as "a description of the repair work necessary to bring an insured property back to pre-Loss condition." (Doc. No. 85-24 at 3.)

*Coverage Decision and Litigation*

On June 12, 2014, Praetorian issued a letter accepting in part and denying in part Arabia Shrine's claim. (Doc. No. 61-11 at 2.) Praetorian agreed to pay $62,376. This amount consisted of $12,376 to remove and replace the pipe, $25,000 for limited additional coverage for water damage under the Masonic Coverage Extension, and $25,000 for damage to personal property. (*Id.* at 8–10.)

Arabia Shrine sent a demand letter to Praetorian on November 10, 2014. Four days later, Praetorian filed this lawsuit. Praetorian seeks a declaratory judgment that the policy does not cover the damages or loss suffered by Arabia Shrine beyond the $62,376 that it has already paid. (Doc. No. 1 at 12.) Arabia Shrine filed an answer, counterclaims, and a third-party complaint on March 17, 2015. It alleges claims for relief against Praetorian, York, and Cunningham Lindsey for (1) noncompliance with the Texas Insurance Code and (2) deceptive trade practices. Arabia Shrine further alleges claims for relief against Praetorian alone for (3) breach of contract and (4) breach of duty of good faith and fair dealing. The claims against Cunningham Lindsey were dismissed without prejudice on July 30, 2015, in accordance with Arabia Shrine and Cunningham Lindsey's stipulation. (Doc. No. 55.) The claims against York were dismissed with prejudice on January 8, 2016, in accordance with Arabia Shrine and York's stipulation. (Doc. No. 80.) In addition, Arabia Shrine has withdrawn its claims for deceptive trade practices. (Doc. No. 86 at 11.)

The four motions before the Court were filed on November 5, 2015, December 18, 2015, December 21, 2015, and January 21, 2016. Responses and replies to each of the motions have been filed, along with a sur-reply to the motion to strike. (Doc. Nos. 76, 85, 86, 88, 89, 90, 91, 92.) The motions are ripe for adjudication.

6

## II.    STANDARD OF REVIEW

A motion for summary judgment should be granted if no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those whose resolution "might affect the outcome of the suit under the governing law." *Willis v. Roche Biomedical Labs.*, 61 F.3d 313, 315 (5th Cir. 1995) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248).

The moving party bears the burden of demonstrating that there is no genuine dispute as to any material fact, but it need not negate the elements of the nonmoving party's case. Fed. R. Civ. P. 56(a); *Willis*, 61 F.3d at 315 (citing *Celotex*, 477 U.S. at 322–23); *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). If the burden of proof at trial lies with the nonmoving party, the moving party may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam)).

Once the moving party has met its burden, the nonmoving party must come forward with specific evidence that supports its claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). Simply resting on the allegations in the pleadings will not suffice. Nor will this burden be satisfied "by 'some metaphysical doubt as to the material facts, by conclusory allegations, by

7

unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540

(quoting *Little*, 37 F.3d at 1075). "[T]he plain language of Rule 56(c) mandates the entry of

summary judgment, after adequate time for discovery and upon motion, against a party who fails

to make a showing sufficient to establish the existence of an element essential to that party's

case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at

322.

        In deciding a summary judgment motion, the court must draw all reasonable inferences in

favor of the nonmoving party, and it cannot make credibility determinations or weigh the

evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477

U.S. at 255; *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.   LEGAL FRAMEWORK

        The Court has jurisdiction based on the diversity of the parties' citizenship; therefore, the

Court applies Texas law. *Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th

Cir. 1998). The Texas Supreme Court has established a burden-shifting framework for insurance

disputes. "Initially, the insured has the burden of establishing coverage under the terms of the

policy." *Gilbert Tex. Const., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 124 (Tex.

2010). "If the insured proves coverage, then to avoid liability the insurer must prove the loss is

within an exclusion." *Id.* "If the insurer proves that an exclusion applies, the burden shifts back

to the insured to show that an exception to the exclusion brings the claim back within coverage."

*Id.*

        Texas law requires insurance policies to be interpreted according to "the rules of

construction that are applicable to contracts generally." *Cicciarella v. Amica Mut. Ins. Co.*, 66

F.3d 764, 767–68 (5th Cir. 1995). The terms of the policy are enforced "as written," the

interpretation must "give effect to the intentions of the parties as expressed" in the policy, and the policy must be interpreted as a whole. *Id.* at 768. "Policy terms are given their ordinary and commonly understood meaning unless the policy itself shows the parties intended a different, technical meaning." *Don's Bldg. Supply, Inc. v. OneBeacon Ins. Co.*, 267 S.W.3d 20, 23 (Tex. 2008).

"If a term is susceptible to more than one reasonable interpretation, [courts] must resolve that uncertainty in favor of the insured." *Evanston Ins. Co. v. Legacy of Life, Inc.*, 370 S.W.3d 377, 380 (Tex. 2012). Thus, the Court's "inquiry is whether the construction advanced by [the insured] is a reasonable interpretation." *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991). Whether a term is ambiguous is a question of law. *Cicciarella*, 66 F.3d at 768. However, once a term is deemed ambiguous, the use of extrinsic evidence to determine the parties' intent is a question of fact. *Id.* Insurance policies are to be "liberally [construed] in favor of the insured, especially when dealing with exceptions and words of limitation." *Id.*

## IV.   ANALYSIS

### A.  Coverage

Under the policy's "Building and Personal Property Coverage Form," Praetorian agreed to "pay for direct physical loss of or damage to Covered Property at the [Arabia Shrine Temple] caused by or resulting from any Covered Cause of Loss." (Doc. No. 61-3 at 29.) The policy thus has two coverage requirements. First, the loss or damage must be to "Covered Property." Second, the cause of the loss or damage must be from a "Covered Cause of Loss."

The policy defines "Covered Property" as "the type of property described in [Section A.1] and limited in A.2., Property Not Covered." (*Id.*) In relevant part, Section A.1 defines

"Covered Property" to include:

> a. Building, meaning the building or structure described in the Declarations, including:
>> . . .
>> (3) Permanently installed:
>>> (a) Machinery and
>>> (b) Equipment;
>> (4) Personal property owned by [the insured] that is used to maintain or service the building or structure or its premises, including:
>>> (a) Fire-extinguishing equipment;
>>> . . . .

(*Id.*) Section A.2, "Property Not Covered," states in pertinent part:

> Covered Property does not include:
> . . .
> g. Foundations of buildings, structures, machinery or boilers if their foundations are below:
>> (1) The lowest basement floor; or
>> (2) The surface of the ground, if there is no basement;
> h. Land (including land on which the property is located) . . . ;
> . . .
> m. Underground pipes, flues or drains; . . . .

(*Id.* at 30.)

Turning to the second requirement, the policy broadly defines "Covered Causes of Losses" to mean "direct physical loss unless the loss is excluded or limited in this policy."[3] (Doc. No. 62-4 at 2.)

---

[3] At times, the parties appear to dispute whether the 2007 Form, Causes of Loss – Special Form CP 10 30 06 07, or the 2012 Form, Causes of Loss – Special Form CP 10 30 10 12, governs. Praetorian relied on the 2007 Form in its motion for partial summary judgment. However, in its combined reply and response, "Praetorian agrees that the Causes of Loss – Special Form CP 10 30 10 12 should be considered because of the liberalization clause." (Doc. No. 86 at 8.) The liberalization clause refers to the policy condition that if Praetorian adopts "any revision that would broaden the coverage . . . without additional premium within 45 days prior to or during the policy period, the broadened coverage will immediately apply." (Doc. No. 61-4.) Accordingly, the Court will consider the 2012 Form.

### 1. Arabia Shrine's Burden to Establish Coverage

Arabia Shrine argues that the policy covers all "damages associated with leakage from the Facility's fire-extinguishing equipment." (Doc. No. 76 at 13.) In support, Arabia Shrine cites to six policy provisions: an exemption to the Water Exclusion Endorsement, an exemption to the corrosion exclusion, an exemption to the freezing exclusion, the limitation to covered causes of loss for defective systems,[4] the exemption to the corrosion exclusion for "specified causes of loss,"[5] and "Covered Property" including "fire-extinguishing equipment."

Arabia Shrine's reliance on four exemptions to exclusions is misplaced. The Fifth Circuit, interpreting Texas law, has explained that "an exception to an exclusion" should not be equated "to an affirmation of coverage." *Columbia Cas. Co. v. Georgia & Florida RailNet, Inc.*, 542 F.3d 106, 112 (5th Cir. 2008) ("An exclusion subtracts from coverage, i.e., any exception to it is no longer specifically exempt from coverage. Yet nothing gives the exception the affirmative status of being covered by the policy.") Therefore, Arabia Shrine cannot meet its initial burden of establishing coverage by relying on exemptions to exclusions.

---

[4] Limitation C.4 to the "Covered Causes of Loss" states: "We will not pay the cost to repair any defect to a system or appliance from which water, other liquid, powder or molten material escapes. But we will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage: a. Results in discharge of any substance from an automatic fire protection system; or b. Is directly caused by freezing." (Doc. No. 62-4 at 8.)

[5] The policy states that Praetorian "will not pay for loss or damage caused by or resulting from any of the following: . . . d. . . . (2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself." (Doc. No. 61-4 at 17.) "But if an excluded cause of loss that is listed in 2.d.(1) through (7) results in a 'specified cause of loss' or building glass breakage, we will pay for the loss or damage caused by that 'specified cause of loss' or building glass breakage." (*Id.*) The policy further states that "[w]ords and phrases that appear in quotation marks have a special meaning. Refer to Section G., Definitions." Section G., in turn, defines "specified causes of loss" as "fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire-extinguishing equipment; sinkhole collapse; volcanic action; failing objects; weight of snow, ice or sleet; water damage."

Of the remaining two policy provisions, neither creates the broad coverage for leakage from fire-extinguishing equipment that Arabia Shrine asserts. First, the limitation to covered causes of loss for defective systems says that Praetorian "will pay the cost to repair or replace damaged parts of fire-extinguishing equipment if the damage: a. Results in discharge of any substance from an automatic fire protection system; or b. Is directly caused by freezing." (Doc. No. 62-4 at 8.) This provision, therefore, applies only if certain conditions are met. While it is undisputed that the freezing condition did not occur, the parties dispute whether the discharge condition is met. Second, "Fire-extinguishing equipment" has a more specific meaning than Arabia Shrine will admit. This is addressed more fully in the next section.

### a.  Covered Property: Pipe

Arabia Shrine contends that the failed pipe qualifies as "Covered Property" under two provisions: "Fire-extinguishing equipment" and "Permanently installed machinery and equipment." Praetorian responds that "the only fire-extinguishing equipment that is covered is *personal* property, not *real* property." (Doc. No. 86 at 4.) Because the failed pipe is part of the automatic sprinkler system that is permanently installed in the building, it is not personal property. Praetorian further argues that the failed pipe falls within "Property Not Covered" as an underground pipe.

The Court agrees with Praetorian that the failed pipe does not qualify as "Fire-extinguishing equipment." Arabia Shrine's argument ignores the words that precede "Fire-extinguishing equipment," which unambiguously limit the coverage to "Personal property." It is undisputed that the failed pipe was located "beneath the concrete floor slab of the ballroom lobby," (Doc. No. 61-8 at 4), and that, to remove and replace the pipe, the contractor had to cut the concrete slab, excavate, and back fill, (Doc. No. 61-10). Thus, the pipe is not personal

property.

In addition, the policy in the "Masonic Coverage Extension – Property" endorsement distinguishes between the automatic fire suppression system and fire-extinguishing equipment. This section adds coverage for expenses related to recharging fire-extinguishing equipment:

> We will pay your expenses to recharge your portable fire extinguishing equipment or your automatic fire extinguishing system . . . . The recharge must be necessary because of leakage or discharge caused by or resulting from a Covered Cause of Loss, including its use to control or prevent a fire, or because of accidental discharge, at or within 1,000 feet of the described premises.

(Doc. No. 61-4 at 35.) Reading the policy as a whole, the only reasonable interpretation is to find that "Fire-extinguishing equipment" in "Covered Property" does not include the automatic fire-extinguishing system.

Arabia Shrine's reliance on Mr. Ormsby's report has no bearing on the issue. The Texas Supreme Court has cautioned that an insurance policy must be interpreted "according to what it says, not what regulators or individual insurers thought it said." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 745 (Tex. 2006). Moreover, as Praetorian points out, Mr. Ormsby was not tasked with making a final coverage decision.

The parties agree that the automatic fire-extinguishing system is permanently installed. However, that does not end the inquiry. Under the policy's definition of "Covered Property," the type of property at issue must be included in Section A.1 and not included in Section A.2, "Property Not Covered." (Doc. No. 61-3 at 29.) Therefore, it is not enough for Arabia Shrine to say that the failed pipe is permanently installed machinery or equipment. Arabia Shrine must also demonstrate that the failed pipe is not among the types of property listed in "Property Not Covered." The Court finds that Arabia Shrine has not met its burden because the policy unambiguously lists "Underground pipes" as "Property Not Covered."

13

As mentioned above, the fact that the failed pipe was located "underground," using the ordinary sense of that word, is not in dispute. To accept Arabia Shrine's argument would be to render meaningless the "Underground pipe" limitation. Surely, all underground pipes are "permanently installed." The only reasonable interpretation of the policy is one that gives effect to both "permanently installed machinery or equipment" being covered and "underground pipes" being specifically not covered. *See Gilbert Texas Const., L.P.*, 327 S.W.3d at 126 (Texas law requires courts to "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless.") Accordingly, the Court finds that, even if the underground pipes are part of permanently installed machinery or equipment, they are not covered.

### b.  Covered Property: Foundation

The policy's description of "Property Not Covered" includes "Foundations of building." (Doc. No. 61-3.) The parties dispute whether the concrete slab that heaved and cracked qualifies as a foundation. Mr. Green, an engineer, refers to it as a "concrete floor slab" and does not use the term "foundation." (Doc. No. 61-8 at 4.) Mr. Ormsby and Mr. Sukolics, who are not engineers, refer to it as a "foundation slab" or "foundation," respectively. (Doc. No. 76-7 at 4; Doc. No. 76-13 at 3.) Richard Wright, an engineer retained by Arabia Shrine, concluded that "[t]he concrete floor slab system is not part of the building primary foundation system." (Doc. No. 76-19 at 12.) However, the Court does not need to resolve this dispute because, even assuming that the concrete slab is not a foundation and therefore is "Covered Property," the Court concludes below that the damage occurred as a result of an excluded cause of loss.

### 2.  Praetorian's Burden to Show that an Exclusion Applies

To the extent that loss or damage occurred to qualifying "Covered Property," the parties

14

vigorously dispute whether the cause of that loss or damage fits within the Water Exclusion Endorsement. The Water Exclusion Endorsement creates an exclusion to the Covered Causes of Loss. As a result, Praetorian bears the burden of proving that the exclusion applies.

In relevant part, the Water Exclusion Endorsement provides that Praetorian will not pay for loss or damage caused directly or indirectly by: "Water under the ground surface pressing on, or flowing or seeping through: a. Foundations, walls, floors, or paved surfaces . . . ." (Doc. No. 61-4 at 25.) Praetorian argues that this provision excludes from coverage any loss or damages for which it has not already paid. Under the plain meaning of the words of the exclusion, the Court agrees.

Arabia Shrine responds that the cause of the damage falls within the policy's coverage for "water damage" and that the 2012 Form makes clear that the Water Exclusion Endorsement does not apply to "water damage." In crafting this argument, Arabia Shrine offers the definition of water damage from Section G.2.c of the policy as if it creates a universal grant of coverage. (Doc. No. 76 at 15.) It does not. *See Gen. Acc. Ins. Co. v. Unity/Waterford-Fair Oaks, Ltd.*, 288 F.3d 651, 656 (5th Cir. 2002) (rejecting this same argument). In Section G.2.c, water damage is being defined as one of the fourteen "specified causes of loss." (Doc. No. 62-4 at 11.) "Specified causes of loss," in turn, come into play only as exemptions to various exclusions to Covered Causes of Loss, including the corrosion exclusion. (*Id.* at 4.) Importantly, "specified causes of loss" is not an exemption to the Water Exclusion Endorsement. (Doc. No. 61-4 at 25.) Arabia Shrine's argument conflates separate parts of the policy by taking the water damage definition in Section G.2.c out of context. The Water Exclusion Endorsement establishes that damage caused by certain types of water is not covered. For example, flood, surface water, mudslide, "[w]ater that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump, or

15

related equipment," and "[w]ater under the ground surface pressing on, or flowing or seeping through . . . [f]oundations, walls, floors or paved surfaces" are all excluded causes of loss. (*Id.*) Other types of water that are not mentioned in the Water Exclusion Endorsement, however, are "covered water." Section G.2.c is referring to damage caused by these unlisted, and therefore covered, types of water. (Doc. No. 62-4 at 10.)

Arabia Shrine further contends that Praetorian's interpretation of the Water Exclusion Endorsement would mean that it would exclude its own ensuing loss provision for sprinkler leakage. The Court disagrees. The ensuing loss provision for sprinkler leakage would still apply, even if Praetorian's interpretation of the Water Exclusion Endorsement is adopted. Sprinklers are not under the surface of the ground. Therefore, any leakage from them would not be "[w]ater under the ground surface." Here, however, the failed pipe was buried and, therefore, all water emanating from it was "under the ground surface."

Lastly, Arabia Shrine argues that a sentence in the 2012 Form "is a death-knell of Praetorian's entire coverage defense." (Doc. No. 76 at 17.) The sentence in question reads "such water is not subject to the provisions of the Water Exclusion which preclude coverage for surface water or water under the surface of the ground." (Doc. No. 62-4 at 11.) Once again, however, Arabia Shrine has taken this sentence out of context. Like the "water damage" definition discussed above, this sentence appears in the section of the policy that discusses "specified causes of loss" and therefore has relevance only when "specified causes of loss" are named as an exception to an exclusion, such as the corrosion exclusion. Here, the exclusion that applies is not the corrosion exclusion but the Water Exclusion Endorsement. Moreover, as Praetorian points out, the Water Exclusion Endorsement is among those exclusions to which the following "anti-concurrent causation" clause applies: "We will not pay for loss or damage caused directly or

16

indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss." (Doc. No. 61-4 at 15.) This provision means that any other concurrent causes of loss are irrelevant if the Water Exclusion Endorsement applies. *See JAW The Pointe, L.L.C. v. Lexington Ins. Co.*, 460 S.W.3d 597, 608 (Tex. 2015) ("agree[ing] with the Fifth Circuit that, under Texas law, the [insurance policy's] anti-concurrent-causation clause and the exclusion for losses caused by flood, 'read together, exclude from coverage any damage caused by a combination of wind and water'") (quoting *Leonard v. Nationwide Mut. Ins. Co.*, 499 F.3d 419, 430 (5th Cir. 2007)).

### 3. Arabia Shrine's Burden to Demonstrate that an Exception to the Exclusion Brings Coverage Back

Praetorian has met its burden to show that the Water Exclusion Endorsement excludes coverage. Now, the burden returns to Arabia Shrine to demonstrate that an exception to that exclusion brings coverage back. Arabia Shrine argues that the ensuing loss clause for sprinkler leakage serves this function. The provision states, "But if any of the above, in Paragraphs 1. through 5.,[6] results in fire, explosion or sprinkler leakage, we will pay for the loss or damage caused by that fire, explosion or sprinkler leakage (if sprinkler leakage is a Covered Cause of Loss)." (Doc. No. 61-4 at 25.) Praetorian contends that this ensuing loss provision does not bring coverage back because no "new loss to property that is of a kind not excluded by the policy" occurred. *Platek v. Town of Hamburg*, 26 N.E.3d 1167 (2015).

The Court is persuaded by Praetorian's argument. The language of the policy provision is unambiguous in requiring a particular sequence of events. First, an excluded cause of loss that is

---

[6] Paragraph 4 is the particular Water Exclusion Endorsement at issue in this case for "Water under the ground surface pressing on, or flowing or seeping through: a. Foundations, walls, floors, or paved surfaces . . . ." (Doc. No. 61-4 at 25.)

listed in Paragraphs 1 through 5 must occur. Then, that excluded cause of loss must "result[] in" a fire, explosion, or sprinkler leakage. Finally, that fire, explosion or sprinkler leakage must cause loss or damage. Here, step two, and necessarily step three, are missing. Although an excluded cause of loss occurred, there is no evidence that the water under the surface of the ground from the failed pipe "resulted in" sprinkler leakage or that a subsequent sprinkler leakage caused further loss or damage. Because Arabia Shrine has not met its burden to show that an exception to the exclusion applies, the Court will grant Praetorian's motion for summary judgment on the coverage issue.

## V.   COUNTERCLAIMS

The Court now turns to the motion for summary judgment on Arabia Shrine's counterclaims. Excluding the withdrawn claims for deceptive trade practices, Arabia Shrine alleges that Praetorian (1) did not comply with the Texas Insurance Code; (2) breached its contract; and (3) breached its duty of good faith and fair dealing.

### A.   Noncompliance with the Texas Insurance Code

Arabia Shrine alleges that Praetorian did not comply with six different sections of the Texas Insurance Code. Arabia Shrine maintains that these claims are viable even if the Court agrees with Praetorian's coverage decision. Praetorian argues that Texas law precludes extra-contractual claims when no breach of the insurance policy exists.

"When the issue of coverage is resolved in the insurer's favor, extra-contractual claims do not survive." *State Farm Lloyds v. Page*, 315 S.W.3d 525, 532 (Tex. 2010). However, there are two exceptions to this general rule. First, "the insurer may commit some act, so extreme, that would cause injury independent of the policy claim." *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 341 (Tex. 1995). Second, the insurer may breach its duty "to timely investigate its insureds'

claims." *Id.*

Arabia Shrine makes numerous arguments in its response to Praetorian's motion for summary judgment on the counterclaims. However, the vast majority of these arguments depend on the coverage issue being decided in Arabia Shrine's favor. Omitting the arguments that are intertwined with the coverage issue, Arabia Shrine contends that Praetorian failed to conduct a reasonable investigation because it unreasonably delayed making its coverage decision. Arabia Shrine maintains that "Praetorian had everything it needed to make a coverage determination as of April 14, 2014," and violated the Texas Insurance Code by not providing its letter accepting in part and denying in part the claim until June 12, 2014. (Doc. No. 85 at 25.) Section 542.056(a) of the Texas Insurance Code provides:

> Except as provided by Subsection (b) or (d), an insurer shall notify a claimant in writing of the acceptance or rejection of a claim not later than the 15th business day after the date the insurer receives all items, statements, and forms required by the insurer to secure final proof of loss.

The only evidence Arabia Shrine provides to support this argument is the opinion of Mr. Ormsby. (Doc. No. 85-5 at 35.) At Mr. Ormsby's deposition, he was discussing the April 14, 2014, report from Rimkus and was asked, "[A]fter getting this engineering report, you had everything that you needed to say we're going to accept or reject the coverage aspect of this claim?" (*Id.*) Praetorian's counsel objected. Then Mr. Ormsby replied, "I believe – I believe I had what I needed – with regard to coverage." (*Id.*) This mere scintilla of evidence is insufficient to create a genuine issue of material fact. The record contains an April 30, 2014, letter from Mr. Ormsby to Arabia Shrine's attorney, informing him of Praetorian's decision to seek further analysis of the pipe by submitting it to a metallurgist for examination. (Doc. No. 76-10 at 2.) This letter further stated that "the analysis of the cause of the loss remains pending." (*Id.*) In

19

addition, the April 14, 2014, report itself included this recommendation: "Detailed inspection by a metallurgist would be required to determine the exact cause of the hole in the elbow." (Doc. No. 61-8 at 6.) Accordingly, Arabia Shrine has presented insufficient evidence to support this claim and Praetorian's motion for summary judgment must be granted.

### B.  Breach of Contract

Arabia Shrine's breach of contract claim is co-extensive with the coverage issue. The only contract at issue is the insurance policy. Because the Court has found that Praetorian properly denied coverage beyond what it already paid under the terms of the policy, the Court likewise finds that Praetorian did not breach the insurance policy.

### C.  Breach of Duty of Good Faith and Fair Dealing

Arabia Shrine's final claim also cannot survive the coverage issue being decided in Praetorian's favor. Under Texas law, a claim for breach of duty of good faith and fair dealing is has two elements: "(1) there is an absence of a reasonable basis for denying or delaying payment of benefits under the policy and (2) the carrier knew or should have known that there was not a reasonable basis for denying the claim or delaying payment of the claim." *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338, 340 (Tex. 1995). Here, Arabia Shrine cannot establish the first element, given the Court's coverage decision. Therefore, the Court must grant Praetorian's motion for summary judgment on this claim.

## VI.  MOTION TO STRIKE

Arabia Shrine's motion to strike seeks to exclude any references to a December 3, 2015, report of Paul Phillips and Ken Sumner and excerpts from the January 14, 2016, depositions of Mr. Green and Mr. Phillips. (Doc. No. 87 at 2.) Praetorian referred to this evidence in its Combined Reply to Arabia Shrine's Response to Praetorian's Motion for Partial Summary

Judgment and Response to Arabia Shrine's Cross-Motion for Partial Summary Judgment. (Doc. No. 86.) The Court has decided the dispositive motions without relying on this evidence. Accordingly, the motion to strike will be denied as moot.

**VII.    CONCLUSION**

For the reasons above, Praetorian's motions for summary judgment are **GRANTED**, Arabia Shrine's cross-motion for summary judgment is **DENIED**, and Arabia Shrine's motion to strike is **DENIED AS MOOT**.

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas, on this the 19th day of February, 2016.

THE HONORABLE KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE